THAYER, Appellant, vs. HUMPHREY, Assignee, Respondent.
DAVIES, Appellant, vs. HUMPHREY, Assignee, Respondent.

*September 11 — November 8, 1895.*

*Partnership: Insolvency: Voluntary assignment: Rights of joint and individual creditors: Ostensible firm: New firm assuming debts of old one.*

A. J. Goss and J. D. Putnam were partners, under the firm name of J. D. Putnam & Co.   The firm was insolvent.   It was dissolved, J. D. Putnam selling out his interest, with the understanding that the business should be continued by a new firm known as J. B. Goss & Co.   The consideration for the sale on Putnam's part was that the new firm should assume and pay all the old firm debts. He supposed that J. B. Goss was the real purchaser, though the transfer was made to A. J. Goss, who shortly after transferred to J. B. Goss.   The new firm was advertised as J. B. Goss & Co., and no notice was given of any change from the old firm other than what was indicated in the change of the firm name.   A. J. Goss in fact dropped out; so that J. B. Goss became sole proprietor.   The new concern had no way of paying the old firm debts, except out of the assets derived from the old firm and the accumulations of the business.   The business was conducted a short time under the new management, and then J. B. Goss made an assignment for the benefit of creditors, and about the same time A. J. Goss made an assignment for the benefit of creditors.   A. J. Goss being held to be an ostensible partner and liable for all the debts of the concern of J. B. Goss & Co. by holding out, and there being three sets of creditors,— namely, those of the old concern of J. D. Putnam & Co., those of the new concern of J. B. Goss & Co. (consisting of J. B. Goss and A. J. Goss as an ostensible partner), and those of J. B. Goss alone — and there being no firm assets of the ostensible

firm known as J. B. Goss & Co., unless the assets and property owned by J. B. Goss in the business conducted under the name of J. B. Goss & Co. should be considered partnership assets in equity by reason of A. J. Goss being liable to all the creditors as a partner by holding out, in the administration of the affairs of the two insolvent concerns, in equity, the following principles apply:

1. In the administration of the affairs of a partnership and of the individual members thereof, the fixed rule must be applied that joint estate goes first to joint creditors, and separate estate to separate creditors, with the exception that where there are no partnership assets, and there is no living solvent partner, partnership creditors may prove with the separate creditors of a partner in the settlement of his estate *pari passu.*

2. Partnership creditors have no lien, strictly so called, on partnership assets, but must work out their preference over the creditors of the individual members of the partnership through the equities of such members.

3. If one of a partnership sells out, *bona fide*, his interest to his copartner or to another, without in any way retaining his equity to have the partnership creditors paid out of the assets, the property is converted into the individual property of the purchaser, free from all the equities of the seller, even if the purchaser, as the consideration for such purchase, agrees to pay the firm debts; otherwise if the purchaser agrees expressly or impliedly to apply the assets to such purpose.

4. The word "assets," used in No. 1, is not confined to assets at law, but includes all assets applicable to the payment of the partnership debts, under the well-defined principles for the administration of the affairs of insolvent partnerships under the direction of a court of equity.

5. Those who deal with persons representing themselves to creditors generally as partners in a certain business are entitled to have the property used in such business applied to the payment of the debts incurred in such business in preference to the individual debts of the members of the partnership, and the ostensible member of such partnership is likewise entitled to have the assets of the ostensible firm so applied.

6. If a member of an insolvent firm sells out with the understanding that the business is to be continued with the same assets, and the purchaser or purchasers, as consideration for the sale, are to assume and pay the old debts, and the circumstances are such as to evidence the fact that the purpose of the transaction is to pay the

old firm debts and to wind up the old partnership concern by the payment of the debts of such concern out of the partnership assets and a continuation of the business, the court is warranted in concluding that the equity of the outgoing partner to have the assets of the firm applied to the payment of the firm debts is not changed, and that the right of the creditor to enforce it continues.

7. If one of the members of an insolvent firm sells out his interest to an outside party or to his associates, and thereby a new firm is formed, which assumes the debts of the old firm, the intention of all the parties being that the new firm shall continue the business in substantially the same way with substantially the same assets, and that the old debts shall be paid out of such business, and such new firm subsequently makes an assignment for the benefit of creditors, in the administration of the assignment the creditors of the old and the new firm may prove their claims *pari passu*, and be preferred over individual creditors of the members of such new firm.

By reason of the facts disclosed in this case, the court being warranted in finding an implied promise, made at the time J. D. Putnam sold out, that the old firm debts should be paid out of the firm assets, *held*, that an equity was reserved which the creditors can enforce, and that appellants, the one being a creditor of the old firm of J. D. Putnam & Co., and the other of the ostensible firm of J. B. Goss & Co., cannot prove *pari passu* with the individual creditors of A. J. Goss in his assignment, but they can both prove *pari passu* with the creditors of J. B. Goss in his assignment.

NEWMAN, J., and PINNEY, J., dissent.

[Syllabus by MARSHALL, J.]

APPEALS from orders of the circuit court for St. Croix county: E. B. BUNDY, Circuit Judge. *Affirmed*.

Each of the above-named appellants filed a claim against respondent's assignor in his assignment proceedings, and such proceedings were had that an issue was made up as to each in respect to whether he is entitled to share *pari passu* with the other creditors of such assignor. The decision was against the claimants, upon the ground that they are partnership creditors. The facts in regard to the existence of a partnership doing business at River Falls, Wis., composed of J. D. Putnam and A. J. Goss, its dissolution, and the sub-

sequent existence of the ostensible firm of J. B. Goss & Co.,
composed of J. B. Goss, the actual owner, and A. J. Goss,
the ostensible partner, as stated in *Thayer v. Goss, ante*, p. 90,
and *Gibbs v. Humphrey, ante*, p. 111 (decided at this term),
may be considered as facts here; and otherwise the facts
necessary to present the legal questions involved are suffi-
ciently set out in the opinion.

For the appellants there were briefs by *F. M. White* and
*J. S. White*, and oral argument by *F. M. White*.

For the respondent there was a brief by *Spooner, Sanborn,
Kerr & Spooner*, and oral argument by *A. L. Sanborn, Chas.
P. Spooner*, and *J. B. Kerr*.

MARSHALL, J.  There are no findings of fact in these cases,
but the evidence distinctly shows that the firm of J. D. Put-
nam & Co., on the 3d day of November, 1891, when Putnam
sold out as hereafter stated, was hopelessly insolvent; that
J. D. Putnam, the managing partner of the firm, was insolv-
ent as well; that he desired to retire from the business and
have its affairs closed up, and, in order that this might be
done without an assignment on his part and on the part of
the firm as well, which, it was thought, would imperil the
private business of A. J. Goss, it was agreed that the firm
should be dissolved, and that Putnam should transfer his
interest in the firm property and also his individual property
for the benefit of the firm, and that the business should be
thereafter continued under some new management, in which
the old debts should be assumed and paid through its opera-
tions.   J. B. Goss, the son of A. J. Goss, conducted the ne-
gotiations for the latter, but it was concluded in such a way
that Putnam believed, and had a right to believe, that the
son was to take his (Putnam's) place in the firm; that Put-
nam was simply to step out and J. B. Goss to step in.  When
the transfer was made, it was in form to A. J. Goss, but it
satisfactorily appears that Putnam supposed that J. B. Goss

was the real purchaser, and that the business was to be carried on so as to liquidate the firm debts and eventually relieve him from liability. The agreement of dissolution expressly stated that the business would be conducted by J. B. Goss & Co., who would settle all claims of the old partnership. It was so advertised to the world, over the signatures of J. D. Putnam and A. J. Goss; J. B. Goss managing the whole affair. At this time the legal title to the property was in A. J. Goss, but he soon afterwards conveyed it to J. B. Goss, who thereafter held it as the real owner of the business, though the same was always carried on under the name of J. B. Goss & Co., and all the old creditors, pursuant to the agreement made at the start, as they presented their claims, were recognized as creditors of J. B. Goss & Co., down to the time of the assignments of J. B. Goss and A. J. Goss, hereafter mentioned.

Through the confusion surrounding the sale — by reason, among other things, of the claim on the part of Putnam that J. B. Goss was the purchaser and came in and took his place, while the title was nevertheless at first made to A. J. Goss; that the business was, however, from the start, advertised as that of J. B. Goss & Co., and that, soon after the new arrangement, the property was actually conveyed to J. B. Goss, and that it continued to the end to be administered by him as J. B. Goss & Co. and the old debts to be recognized as the debts of J. B. Goss & Co., while there was no firm in fact,— it may be clearly seen that the real purpose on the part of Putnam was to turn over his property for the benefit of the creditors of the partnership; that this was well known to both A. J. and J. B. Goss; that J. B. Goss immediately took charge of all the assets of the concern and administered them according to such understanding; that A. J. Goss made the title over for the same reason, and, for the purpose of having the partnership business settled up without involving him in his private enterprises, to

have it so run along, pending the settlement, that all the old debts might become really the debts of his son, while the delusion was kept up that there was a firm, J. B. Goss & Co., and that the "& Co." stood for A. J. Goss. In short, it is clear that J. D. Putnam, J. B. Goss and A. J. Goss intended, in all they did, to have the business and assets of J. D. Putnam & Co. devoted to the payment of the debts of the old partnership and of the new management, and all their acts are consistent with such intention and not with any other, though, of course, J. D. Putnam was not a party to the scheme by which it was attempted to convert the liabilities of J. D. Putnam & Co. into the personal liabilities of J. B. Goss.

It is quite clear that while, after the Putnam sale, the business was run by J. B. Goss as J. B. Goss & Co., and though he was at law the actual owner of the property, A. J. Goss was, by his consent, so held out to creditors generally as a partner that all persons who had dealt with the old firm and constituted its creditors, and all who dealt with the new firm as well, had a right to, and did, consider that the only change that had taken place was that J. D. Putnam had stepped out and that J. B. Goss had stepped in, and that the debts of the old firm had been assumed by, and became the debts of, the new firm. We must assume, in the absence of evidence to the contrary, though the evidence fairly establishes the fact, that all persons who did business with J. B. Goss & Co. supposed that there was a firm in fact as well as in name, and that the "& Co." stood for A. J. Goss.

The ostensible firm actually assumed, by agreement with the creditors, nearly all the debts of the old concern, and among them the debt of the appellant *Lottie Thayer*, but did not so assume the debt of the appellant *Davies*. Such ostensible firm also incurred other obligations. It was insolvent from the start, and, in the course of events,— in

effect, by the act of J. B. Goss,— made an assignment for the benefit of creditors; and A. J. Goss, being insolvent, made an assignment for the benefit of creditors as well. There was then, in fact, no firm, though there was an ostensible firm; no firm assets, strictly so called, because there was no firm in fact; yet there are assets that were owned and used in the business of the ostensible firm of J. B. Goss & Co., and that passed into the possession of the assignee of J. B. Goss,— hence assets of the ostensible firm. There is no living solvent partner.

Now, in this situation, can the creditors of J. B. Goss, doing business as J. B. Goss & Co., who were so circumstanced as to be entitled to hold J. B. Goss and A. J. Goss liable as members of an ostensible firm,— and all the creditors, at least of the new concern, including those having claims against the old firm that, by arrangement with them, have been assumed and made debts of J. B. Goss & Co., are so circumstanced in fact,— prove their claims *pari passu* with the individual creditors of A. J. Goss in his assignment?   Also, can the creditors of the firm of J. D. Putnam & Co. so prove?

This presents interesting questions of law, some of which have not heretofore been presented to or decided by this court,— questions upon which there is such conflict of authority in this country that the true rule to be adopted has not been arrived at without difficulty, and then not with the unanimous decision of the court, which is to be regretted. Nevertheless, after careful consideration of the state of the law as held by the courts of this country and of England as well, we have, as we believe, reached a conclusion thoroughly grounded in the well-recognized principles of equity jurisprudence, which should be applied in the progressive spirit that ever has and should ever characterize the growth and application of such principles.   They should not only not be lost sight of, but they should not be fenced in and restricted

within such narrow limits as to lead to a suspicion of their correctness, but should be applied on such well-defined lines as to leave no doubt in respect to their true character and scope.

There are several propositions of law that apply which are well established,— too well to need to be more than stated,— among which are that the assets of an insolvent partnership, in insolvency proceedings, must be applied first to the payment of the partnership debts; that, generally speaking, partnership creditors cannot prove in competition with the individual creditors of a partner; that the fixed rule is that joint estate must go to joint creditors, and separate estate to separate creditors, though the former may prove *pari passu* with separate creditors when there is no living solvent partner and no partnership assets.

Now, in this case there is no solvent partner.  J. D. Putnam, J. B. Goss, and A. J. Goss are all insolvent.  So, keeping in mind the above-stated propositions of law, the vital question is, Are there any partnership assets to which appellants can resort?  If there are such, then the foundation stone, upon which they construct their claim of right to share *pari passu* with the individual creditors of A. J. Goss, disappears.

On that subject we shall not attempt to harmonize the large number of cases that can be found in this country. The simple question of whether, when there is an ostensible firm by holding out to creditors generally, the property of such firm is to be considered, in equity, joint property for the administration thereof in insolvency, the same as if such property belonged to a firm in fact, is the key to the situation.   That it ought to be so considered is, we assume, too clear for argument; that is to say, if A. and B. do business with persons generally as A. & Co., and incur liabilities to such persons who deal in good faith, believing that there is a firm in fact as well as in name, and under such circum-

stances that they have a right to believe it is composed of
A. and B., and the business becomes insolvent, the property
of the ostensible firm should be considered, to all intents and
purposes, in regard to the administration of the business in
insolvency under the control and direction of a court of
equity, the same as if they were partners in fact.   The doc-
trine that estops B. from saying that he is not a partner of
A. at the suit of the creditors of the ostensible firm, should
estop A. from holding that the property is his individual
property to the prejudice of those who dealt with the firm
as a firm in fact, and should estop the creditors of the osten-
sible firm, in the case of the bankruptcy of such firm, from
resorting primarily to the individual property of the mem-
bers of such firm; in short, should work effectually to com-
pel liquidation in all respects the same as if the members of
such firm were just what they seem to be. This is what the
doctrine of estoppel is for; that is what equity is supposed
to accomplish,— to prevent fraud and promote justice be-
tween man and man in the administration of human affairs.
And we are therefore prepared to find that such is the law
as substantially declared by the court of appeals in chancery
of England.

In *In re Rowland & Crankshaw*, 1 Ch. App. 421, the pre-
cise question here under consideration was presented.   The
business was conducted in the name of Rowland & Co.
Crankshaw was held to be the ostensible partner, in a con-
test to determine whether the property should be adminis-
tered in bankruptcy as joint property of Crankshaw and
Rowland, partners, or as the individual property of the one
who was the actual owner. The opinion of the court, which,
being short, can best be stated by quoting it in full so far as
relates to the particular question under consideration, is by
Lord CRANWORTH, as follows:

"In the administration of bankruptcy it has been the ob-
ject from the earliest times to apportion the assets as fairly

as possible between the joint and separate creditors.   There is found much difficulty in doing this satisfactorily, but some rules have been clearly laid down, for instance, that the joint property pays the joint creditors, and the separate property pays the separate creditors.   Now, what is said here is that this estate, though said to be joint, is in fact separate.   These two gentlemen traded under the name of Rowland & Co., and tradesmen supplied them with large quantities of goods, and then they became bankrupts, and it is now said that they were not partners, and that the real arrangement between them was that everything belonged to Crankshaw. That is no reason; and, as Crankshaw suffered Rowland to trade in the name of the firm, any persons trading with him are entitled to say that Rowland & Crankshaw are the persons with whom they dealt and that the goods are joint goods."

This is a most concise statement of the law, as held by the English court of chancery.   The meaning is too plain and unmistakable to leave any room for discussion, and we find that the rule so tersely stated has been adhered to and repeatedly approved in subsequent cases in language rather tending to extend than restrict the principle involved.   In *Ex parte Sheen* (*In re Wright*), 6 Ch. Div. 235, the question was again before the court, where the circumstances were that there was no general holding out, and the court held that where there is no ostensible partnership by a holding out to creditors generally, but only a holding out to two or three creditors, the facts are not sufficient to make the property of the alleged ostensible firm joint estate.   This, though not referring to, inferentially approves *In re Rowland & Crankshaw*.   In *Ex parte Hayman* (*In re Pulsford*), 8 Ch. Div. 11, the question again came before the court of chancery, on appeal from the chief judge in bankruptcy, and *In re Rowland & Crankshaw* was expressly approved.   The case so clearly covers the two cases under consideration that we

quote liberally from the opinion, after stating the facts. Such facts are as follows:

Prior and up to August 31, 1875, Hayman, Catford, and Pulsford carried on business as Hayman, Pulsford & Co. On that date the firm was dissolved and notice was published stating the fact. At the same time a letter was sent to each of the persons with whom the firm had done business, stating the fact of dissolution and that thereafter the business would be carried on by Thomas Pulsford, under the style of Pulsford, Son & Co. Thereafter the business was so conducted. Tom Pulsford, the son of Thomas Pulsford, took an active part in conducting the business up to the time the insolvency occurred, when Thomas Pulsford filed a petition in bankruptcy; and on the suggestion that, on account of the way the business had been conducted, it might be held that the father and son were partners, a petition was also filed by them as joint traders. The creditors resolved upon a liquidation by arrangement, and such resolution was registered. Hayman, a separate creditor of the father in respect to matters outside the firm of Pulsford, Son & Co., appealed from the order for a liquidation of the business as that of a firm, on the ground that there was no partnership. He prevailed, and the registration was canceled, and the decree was not appealed from. Thereafter the father and son signed a declaration of insolvency, upon which Ravenscroft, a creditor, presented a petition alleging that they had treated father and son as partners, under the firm name of Pulsford, Son & Co., on which an adjudication was made against them by consent. Hayman then appealed to the court to annul the adjudication. *On this application, following In re Rowland & Crankshaw, the application was dismissed on the ground that, though no actual partnership had subsisted between father and son, yet the son had been held out as a partner to the petitioning creditor to such an extent as to enable him to maintain the adjudication.* This decision was

not appealed from. Hayman then applied to the court for an order declaring that all, or such portion as the court should think proper, of the estate which appeared in the acts of the bankrupts or either of them as joint estate, formed part of the separate estate of the father, and for a direction that the trustee should treat the same accordingly as separate estate of the father. Hayman was the only separate creditor, that is, creditor outside those of the business of Pulsford, Son & Co. On the hearing the evidence showed that substantially all the creditors did business with Pulsford, Son & Co. as a firm consisting of the father and son, though it appeared that the father was the actual owner of the business and that there was no firm in fact. Hayman's application was refused, and he appealed. On the hearing of this appeal in the chancery division of the high court of justice, JAMES, L. J., propounded to appellant's counsel the following interrogatory: *"If I go to a shop, and find the names Thompson & Jones on the door, and I go in and find Thompson and Jones selling goods, am I not warranted in believing that they are partners?"* to which answer was made in effect: *"That would not change the nature of the assets, and make property which belonged to the father in fact the joint property of father and son,"*— just as it is claimed in this case, it will be observed. Appellants contend that *the fact of holding out sufficient to constitute an ostensible firm of J. B. Goss & Co. will not change the nature of the assets so as to make the individual property of J. B. Goss joint property, in equity, of J. B. Goss & Co.* The positions are identical. In the opinion of the court this is answered by JAMES, L. J. After reciting the facts in *In re Rowland & Crankshaw,* as in Lord CRANWORTH's opinion in that case, he says:

"Every point of that judgment applies to this case, with this single exception, which fact is in favor of the decision of the registrar, that, instead of the words used being '& Co.,' which is an ambiguous term and might mean anybody in

the .world, the words are 'Pulsford, Son & Co.'   But it is said that this conclusion will work hardship to the appellant, who is a creditor of the father alone.   I think that is only one of those misfortunes which occur to persons who deal with others who afterwards become insolvent and become bankrupt, having partners.   *The hardship would have been exactly the same upon Hayman if there had been a real partnership created by a formal instrument.   The same consequences would then have happened as happen where there is only an ostensible partnership.*"   It will be distinctly noted at this point that the court makes no distinction in the administration of estates of an ostensible and an actual firm in bankruptcy.   The lord justice proceeds:   " The rule has been established that joint creditors take the joint estate and separate·creditors take the separate estate, and you only have to consider what is joint and what is separate estate, and you must apply the rule independently of the hardship. The supposed hardships are those which it may inflict in any particular case.   We can only apply the fixed rule that that which is joint estate shall go·to the joint creditors, and that which is separate estate shall go to the separate creditors."

The reasoning of these cases is, in our opinion, unanswerable, and we deduce  therefrom the principle of law that, if a person allows another to carry on business in such a way as to amount to a holding out to persons generally that he and such  other are partners, and credit is given to·both on the supposition that they are partners in fact, the property with which such business is carried on,·though in law.that of  such person, in equity.will be treated as the joint property of such person and such other; and neither of them, nor the creditors of either, can prove up in insolvency in competition with the creditors who have trusted the two as partners and the business as that of the two.   To the same effect is *Van Kleeck v. McCabe*, 87 Mich. 599.·  Applying the law thus stated to the question under consideration,

the conclusion is easily reached that, while there are no firm assets at law of the ostensible firm of J. B. Goss & Co., all the property used by J. B. Goss in conducting the business, in equity, is the joint property of such ostensible firm, and to it all the creditors of such ostensible firm can resort, the same in all respects as if there had been a firm in fact.

This effectually disposes of the appeal of appellant *Lottie Thayer*, though it is as effectually ruled by the law applicable to the *Davies* appeal, as will appear by what follows. Appellant *Davies* never became a creditor of J. B. Goss or of J. B. Goss & Co., by any agreement to which he was a party; and, while his appeal presents the question of whether there is any joint property to which he can resort, such question involves a different question from the one discussed as particularly applicable to the *Thayer* appeal.

We must start the discussion of the *Davies* appeal with the propositions of law — in respect to which, though there is some conflict, they are too well established by the great weight of authority to be questioned by this court — that partnership creditors have no lien on the partnership assets independent. of the equity of the partners, but must work out their preference over the individual creditors of the members of the partnership through the equities of such members; that, so long as the equity of the individual members of the partnership exists to have the partnership property applied to the partnership debts, the creditors have the equity to compel its enforcement; that if one member sells his interest, *bona fide*, to his copartner or a stranger, without in any way retaining his equity to have the partnership creditors paid out of it, the joint property is thereby converted into the individual property of the purchaser. The question to be determined is, in view of the facts that the sale was made by Putnam in consideration of the debts of the partnership being paid; that the firm was insolvent at the time; that the whole transaction was really made by him to re-

lieve himself from the partnership liability; that the property was put into the possession of J. B. Goss for the purpose of continuing the same business with the same assets and effecting a settlement of the old partnership affairs,— all of which clearly appears, Can it be held that the equitable title to the property was changed, so as to affect the equitable right of Putnam to have the creditors of the old firm paid out of it, or were the equitable rights of the outgoing partner and the creditors preserved by reason of the facts, and the assets in the hands of J. B. Goss impressed with a trust to carry out the intention of the parties?

In discussing these questions, full effect should be given to the significant controlling words in the rule, correctly stated in *Willis v. Thompson*, 85 Tex. 301, "without preserving the lien in any manner." In *Conroy v. Woods*, 13 Cal. 626, it was held that where a sale is made by one partner to his copartner, and the consideration for the sale is the payment of the partnership debts, the sale is not *bona fide* and within the meaning of the rule, so as to cut off the equity of the vendor to have the property applied to the payment of the partnership debts. Very few cases can be found that go as far as the California court on this subject, except in the New Hampshire court, which does so, holding that the creditor has an equitable interest independent of the equity of the individual partner. In *Ex parte Cooper*, 1 Mont., D. & D. 358, and *Ex parte Williams*, 11 Ves. 3, it is held that where an outgoing partner sells *bona fide* to his copartner, and takes for his consideration an agreement that the purchaser shall pay the debts, no equitable interest in the property is retained. To the same effect are *Stanton v. Westover*, 101 N. Y. 265; *Fulton v. Hughes*, 63 Miss. 61; *Dimon v. Hazard*, 32 N. Y. 65; and many other cases that might be cited. In *Darby v. Gilligan*, 33 W. Va. 246, it is held that where a firm is insolvent, if a partner sells out to his copartner, and the purchaser agrees to pay the firm debts,

: the sale cannot be considered *bona fide*, so as to cut off the equity of the firm creditors to be preferred; and to the same effect is *Olson v. Morrison*, 29 Mich. 395. · In the latter case Olson and Jones were partners. Olson sold out to Morrison, the consideration being that the vendee should pay the debts of the firm. It sufficiently appears that the firm was insolvent. The vendee neglected to comply with his agreement, and the creditors, joining with the vendor, brought suit to compel performance of the agreement and to subject the property to the payment of the partnership debts. *Held*, that the agreement to pay the debts as consideration for the transfer was a sufficient recognition of the equitable lien of the partnership creditors, tracing the same through the equity of the vendor, to enable them, joining with him, to enforce such equity.

In *Menagh v. Whitwell*, 52 N. Y. 146, it was held that, as between the firm and its creditors, the title of the former to the joint property is not divested by any separate transfers to outside parties for the individual benefit of the respective vendors, and that, when there has been no transfer by the firm as such, conveying the *corpus* of the property, and it remains *in specie,* though transferred by the separate transfers of the individual members, it may yet be followed and reached in the hands of those claiming under such separate transfers, by creditors of the firm. This is upon the theory that neither partner separately has any interest in the *corpus* of the property; that his interest is limited to his proportionate share of what remains after a settlement of all partnership obligations and an accounting between himself and his copartner. A distinction is drawn in this case between a *bona fide* sale by one of a partnership to two of his copartners without reservation, which, under the prevailing rule of *Ex parte Ruffin*, 6 Ves. 119, operates to liberate the assets from the partnership liability, and a sale made by one member of a firm of more than two, to one of the partners, or to

an outside party. In that class of cases the New York courts have uniformly held, since *Menagh v. Whitwell*, that the partnership effects are not liberated from the partnership liability. In this case, if it is held that the sale was really to J. B. Goss, under the New York rule the *corpus* of the property never passed by any act of the firm so as to change the equitable title in respect to creditors existing at the time of the sale.

The trend of the New York cases since *Menagh v. Whitwell* has been to extend the rule which preserves the equity of the creditors in case of the sale by one of the members of an insolvent firm, the purchaser assuming the partnership obligations in place of the outgoing partner, whether such sale is to a copartner or otherwise. This clearly appears by the following, from the opinion in *Bulger v. Rosa*, 119 N. Y. 465: "The equity of the firm creditors cannot be defeated by any attempted conversion of the assets of the insolvent firm into the individual assets of one of the partners, through a transfer by one partner of his interest therein to the other. In such a case, till the assets come to the hands of a *bona fide* purchaser, the same can be reached by the partnership creditors." To the same effect are *Nordlinger v. Anderson*, 123 N. Y. 544, and *Peyser v. Myers*, 135 N. Y. 599. In the latter case there had been a change in the firm some time prior to the assignment for the benefit of creditors, the new firm not having made any express contract to pay the old firm debts. There were two sets of creditors, and, in discussing the subject of their equitable rights, the court said: "The priority of the lien of firm creditors is not divested by the transfer by an insolvent firm of the assets to one or more of the partners, nor can it be affected by any mere change in the personnel of the firm, as by the withdrawal of one partner from the firm or the introduction of another." See, also, *Phelps v. McNeely*, 66 Mo. 554, where it was held that if a partner sells out his inter-

est in the firm to his copartner, who agrees to pay the debts, the firm being at the time insolvent, the equities of the creditors are preserved. The evidence in that case tended to show that there was no property, other than that formerly belonging to the partnership, out of which the firm debts could be paid; but it does not clearly appear whether the court rested its decision on the ground that there was an implied promise under the circumstances to pay the firm debts out of the partnership assets, or on the ground that the insolvency of the firm impeached the *bona fides* of the transaction. The court went further, and held that, notwithstanding the vendee of the property had turned the same out to secure his individual creditors, who had received it as security in good faith, it could nevertheless be reached by the partnership creditors; but this was subsequently overruled in *In re Edwards: Goddard-Peck Grocery Co. v. McCune,* 122 Mo. 426.

We might go on at great length reviewing decisions on this subject, and cite numerous authorities where outgoing partners have been held to retain their equity to have the firm debts paid, and the rights of the creditors to the assets which have come under the control of equity have been worked out through the equity of such partners. Probably there are few questions upon which there is such a conflict of authority as the one under consideration; but nearly all are in harmony with the principle that if the *bona fides* of the transaction is impeached, or if the equity is retained by agreement, express or implied, then the creditors can enforce such equity. The conflict chiefly arises in regard to what circumstances or facts are sufficient to impeach the good faith of the transaction, and in respect to what is sufficient to show a contract that the partnership debts shall be paid out of the partnership assets, and impress a trust upon such assets for that purpose.

By the mere fact of the dissolution of a partnership by

one member selling out to his copartner or to a stranger, the purchaser or purchasers agreeing, as consideration for the purchase, to pay the partnership debts, the firm being insolvent at the time, no presumption of a *bona fide* agreement arises which will operate to change the equitable title of the property; and such agreement must clearly appear to exist inconsistent with the continuance of the equitable rights of the partner, and, through him, of the partnership creditors; else it is retained. Lindley, Partn. 699. If the circumstances are such as to show that the property was merely transferred for the purpose of winding up the affairs of the concern, there being no express agreement that the property shall be exclusively that of the vendee, it will, in case of bankruptcy, be distributed as joint estate. Lindley, Partn. 699, 700. This is upon the presumption that such was the intention of the parties. The presumptions to be indulged in, in such cases, rather go to support an implied agreement to do what in equity and good conscience the parties ought to do. In *Sedam v. Williams,* 4 McLean, 51, and *Marsh v. Bennett,* 5 McLean, 117, it was held that the equity was retained to have the partnership creditors paid out of the partnership assets, and that such assets were impressed with a trust for that purpose by virtue of an express agreement. In *In re Dawson,* 59 Hun, 239, which does not appear to have been appealed from or criticised, it was held that where one member of a firm retires, selling out his interest to a third party, who continues the business with the remaining partner, with whom he enters into partnership, and the partnership assumes the debts of the previous firm, and such new firm becomes insolvent and makes an assignment for the benefit of creditors, the property transferred to the new firm becomes charged in equity with a trust for the payment of the debts of the old firm, which the outgoing partner may enforce. Such holding is certainly equitable and just when applied to a state of facts,

as in this case, which leaves no room for doubt but that it was the intention of all the parties dealing with the property to preserve and administer the partnership assets in the nature of a trust to liquidate the old debts; and to this extent we expressly approve of and apply it here.

This does not in the least trench upon the rule that if a partner sells out, *bona fide*, his interest in the partnership assets and business, without in any manner retaining his equity to have the partnership creditors paid out of such assets, he waives his equity in that regard, but is perfectly consistent with it. If the agreement was express that the debts shall be paid out of the assets, then the equity is retained by express contract; if the circumstances of the transaction show that the contemplation of the parties was that the debts should be so paid, then the equity is retained by implied agreement; and the assets are, in the administration of the affairs of the purchaser in insolvency, as effectually impressed with a trust in favor of the vendor and, through him, the creditors of the old partnership, in the one case as in the other. The circumstances involved in these appeals point unerringly to the conclusion that it was the intention of J. D. Putnam, J. B. Goss, and A. J. Goss that the new concern of J. B. Goss & Co. should continue the old business with the same assets, for the primary purpose of winding up such business and liquidating the debts theretofore contracted in it out of the old assets, so far as practicable. Hence the court below, sitting as a court of equity in the administration of the affairs of A. J. Goss and J. B. Goss, was warranted in concluding that the property of J. B. Goss is impressed with a trust to carry out the intention of all the parties concerned in the dissolution of the old firm and formation of the new concern of J. B. Goss & Co., that the debts of the old firm should be assumed by the new concern and be paid out of the property turned over to it and the operations of the business, so far as this can be done with

due regard to the equities of the creditors who trusted such new concern.

On the subject of whether the two sets of creditors — those of the old firm of J. D. Putnam & Co., and those of the ostensible firm of J. B. Goss & Co.— can all prove in the insolvency proceedings of J. B. Goss, though that subject need not be decided here, we cite *Ex parte Chuck* (*In re Starkey & Whiteside*), 8 Bing. 469, an early English case, which covers the subject; and, so far as we are able to find, it has never been criticised or overruled. The facts were that S. & S. had been doing business for some time as copartners, and were, as such, indebted to various persons. They took in W., and thereafter the business was conducted by S., S. & W., as copartners. The new firm became bankrupt, and there were creditors of both the old and the new firm as well. The court held substantially as follows: "We are of the opinion that the creditors of S. & S. and those of S., S., & W. should be admitted to prove *pari passu* upon the joint assets of the new firm." To the same effect is *Frow, Jacobs & Co.'s Estate*, 73 Pa. St. 459. Foresman sold out his interest in an existing firm, having creditors, to the remaining members, who agreed to pay the debts. The vendees continued business as a firm with the same assets for a time, and finally made an assignment for the benefit of creditors. Held, that the two sets of creditors — those of the old firm and those of the new firm — might prove *pari passu* against the assets of the new firm; that Frow, Jacobs & Co. were liable for the debts as partners in the firm of Foresman & Co., which they took upon themselves when Foresman retired from the firm and they continued the business. When Foresman sold out, the purchasers intended to continue the business. They took all the assets and assumed the debts. The assets became the capital of the new firm, and the old debts became its debts. Under these facts, the court readily reached the conclusion that the creditors of the old and of

the new firm should stand on an equal footing in the settlement of the new firm in bankruptcy. To the same effect are *In re Dawson*, 59 Hun, 239; *Shedd v. Bank of Brattleboro*, 32 Vt. 709; *Filley v. Phelps*, 18 Conn. 294; and *Wright v. Carman*, 19 N. Y. Supp. 696. Held, in latter case, and in *Frow, Jacobs & Co.'s Estate, supra*, and *In re Dawson, supra*, that the debts of the old became, by reason of the facts, the debts of the new firm. To the same effect is *Peyser v. Myers*, 135 N. Y. 599, where it is distinctly held that if there is a change in the personnel of an insolvent firm, and it subsequently makes an assignment for the benefit of creditors,— there being an agreement, express or implied, at the time of the change, that the new firm shall assume and pay the old debts,— the equity of the old creditors is equal to that of the new. There was no express agreement in that case, but the court held that there was an implied agreement.

This effectually disposes of all the questions presented, and leads to the conclusion that neither of the appellants can prove *pari passu* with the individual creditors of A. J. Goss in his assignment, but they can both prove *pari passu* with all the creditors of the ostensible firm of J. B. Goss & Co. in the assignment of J. B. Goss.

This opinion has been quite lengthy, but it may be well justified from the importance of the questions involved. In reaching the conclusion arrived at by the majority of the court, we resort to cases merely to determine what well-defined principles have been established applicable to the facts of the appeals before us. Having come to a satisfactory conclusion in that regard, we endeavor to broadly apply them so as to satisfy effectually the ends of justice, which are obviously the legitimate ends for which such principles have been worked out in the growth of equity jurisprudence. By so doing the assets of J. B. Goss, held and used by him as those of the ostensible firm of J. B. Goss and A. J. Goss, will be marshaled and administered along definite lines, with-

out confusion or uncertainty as to the rights of the various sets of creditors and parties interested.

In order, now, that the principles of equity jurisprudence here applied may definitely appear, we recapitulate as follows:

1. In the administration of the affairs of a partnership and of the individual members thereof, the fixed rule must be applied that joint estate goes first to joint creditors, and separate estate to separate creditors, with the exception that where there are no partnership assets, and there is no living solvent partner, partnership creditors may prove with the separate creditors of a partner in the settlement of his estate *pari passu.*

2. Partnership creditors have no lien, strictly so called, on partnership assets, but must work out their preference over the creditors of the individual members of the partnership through the equities of such members.

3. If one of a partnership sells out, *bona fide,* his interest to his copartner or to another, without in any way retaining his equity to have the partnership creditors paid out of the assets, the property is converted into the individual property of the purchaser, free from all the equities of the seller, even if the purchaser, as the consideration for such purchase, agrees to pay the firm debts; otherwise, if the purchaser agrees *expressly or impliedly* to apply the assets to such purpose.

4. The word "assets," used in No. 1, is not confined to assets at law, but includes all assets applicable to the payment of the partnership debts, under the well-defined principles for the administration of the affairs of insolvent partnerships under the direction of a court of equity.

5. Those who deal with persons representing themselves to creditors generally as partners in a certain business are entitled to have the property used in such business applied to the payment of the debts incurred in such business in

Thayer vs. Humphrey.   Davies vs. Same.

preference to the individual debts of the members of the partne ship, and the ostensible member of such partnership is likewise entitled to have the assets of the ostensible firm so applied.

6. If a member of an insolvent firm sells out with the understanding that the business is to be continued with the same assets, and the purchaser or purchasers, as consideration for the sale, are to assume and pay the old debts, and the circumstances are such as to evidence the fact that the purpose of the transaction is to pay the old firm debts and to wind up the old partnership concern by the payment of the debts of such concern out of the partnership assets and a continuation of the business, the court is warranted in concluding that the equity of the outgoing partner to have the assets of the firm applied to the payment of the firm debts is not changed, and that the right of the creditor to enforce it continues.

7. If one of the members of an insolvent firm sells out his interest to an outside party or to his associates, and thereby a new firm is formed, which assumes the debts of the old firm, the intention of all the parties being that the new firm shall continue the business in substantially the same way with substantially the same assets and that the old debts shall be paid out of such business, and such new firm subsequently makes an assignment for the benefit of creditors, in the administration of the assignment the creditors of the old and the new firm may prove their claims *pari passu*, and be preferred over individual creditors of the members of such new firm.

*By the Court.*— The orders appealed from are affirmed, and the causes remanded for further proceedings according to law.

In the case of *Thayer, Appellant, v. Humphrey, Assignee, Respondent,* the following dissenting opinions were filed:

NEWMAN, J.  *Lottie Thayer* was a creditor, for money lent, of the milling copartnership of J. D. Putnam & Co.  The firm comprised J. D. Putnam and Alfred J. Goss.  It was afterwards dissolved by mutual consent.  The business was thenceforward carried on at the same place under the name of J. B. Goss & Co., who assumed all the debts of J. D. Putnam & Co.  The firm property of J. D. Putnam & Co. was conveyed to James B. Goss, who alone carried on the business under the name of J. B. Goss & Co.  *Thayer* took the note of J. B. Goss & Co. for her claim against J. D. Putnam & Co., and surrendered the old note.  She afterwards recovered a judgment on her new note, against James B. Goss and Alfred J. Goss, in form joint and several.  The trial court found that Alfred J. Goss was not a partner with James B. Goss in the firm of J. B. Goss & Co., but that he was liable to *Thayer* by reason of his being held out to her as a partner.  Both Alfred J. Goss and James B. Goss are insolvent and have made assignments for the benefit of their creditors.  Alfred J. Goss assigned to *H. L. Humphrey*, the respondent; James B. Goss to one Weld.  The assignment of James B. Goss includes all that remains of the property which was of J. D. Putnam & Co.  No mention is made in either assignment of partnership property.  J. D. Putnam, also, is insolvent.  *Thayer* filed her claim, based on her judgment, with the respondent.  It is stipulated that her original claim has become merged in this judgment.  The respondent filed objections to the claim.  The court held that she must first go against the partnership assets, and could not go against the individual assets of Alfred J. Goss until his separate creditors were paid.  From this order *Thayer* appeals.

The rule is fully settled, in the administration of the estates of insolvents, that the partnership debts are primarily payable out of the partnership assets and are entitled to a preference over the individual debts of the insolvent; and

so, in the reverse case, the individual debts are primarily payable out of the individual assets of the insolvent and possess a like preference. The surplus only, after satisfying such priorities, can be reached by the other class of debts. For this purpose the joint estate and the separate estate of the insolvent constitute separate funds, to be administered separately. Story, Partn. (7th ed.), § 376; 17 Am. & Eng. Ency. of Law, 1202, and cases cited in note 1; Parsons, Partn. (4th ed.), § 382; note to *McCulloh v. Dashiell's Adm'r*, 18 Am. Dec. 271; *Murrill v. Neill*, 8 How. 414; *Curtis v. Woodward*, 58 Wis. 499.

There are certain exceptions to this rule, which go to prove and ascertain it. One such exception, which is as well settled as the rule itself, is the case where there are no partnership assets to be administered and no living solvent partner. Where there are no partnership assets to be administered and no living solvent partner, then the joint creditor is entitled to share *pari passu* with the individual creditors of the separate estate. Story, Partn. (7th ed.), § 378; 17 Am. & Eng. Ency. of Law, 1205, and cases cited in note 4; *Curtis v. Woodward*, 58 Wis. 499; Parsons, Partn. (4th ed.), § 384, note 1.

In the instant case there was, in fact, no partnership. There are no partnership assets. There is no living solvent partner. The case seems to come clearly within the exceptions to the rule as above stated. There was no partnership. The trial court so decided, and that is conclusive here. The fact that there was no partnership is absolute proof that there are no partnership assets. It is undisputed that J. D. Putnam, Alfred J. Goss and James B. Goss, all the debtors involved in the controversy, are all and each insolvent.

J. D. Putnam conveyed all his interest in the partnership property of J. D. Putnam & Co., in November, 1891, to Alfred J. Goss. Alfred J. Goss conveyed the entire prop-

erty to James B. Goss.   James B. Goss assigned the entire
property for the benefit of his creditors.   Alfred J. Goss
has assigned all his property for the benefit of his creditors.
There is absolutely no property in existence which any one
claims to be partnership assets of James B. Goss and Alfred
J. Goss.   To require the petitioner to pursue for her remedy
any such supposititious partnership assets is to mock her with
the delusive promise of a remedy which must inevitably
disappoint the expectation which it fosters.

The circumstance that the property which James B. Goss
assigned for the benefit of his creditors is, in part, the same
property which was once the firm property of J. D. Putnam
& Co., is of no significance.   No equity of the creditors of
J. D. Putnam & Co. followed this property into the hands of
James B. Goss.   There is no hint of bad faith in the trans-
fer, or that it was made in contemplation of insolvency.   The
rights of creditors in the assets of a partnership must be
worked out through the equities of the partners.   If the
partner has no right, the creditor has none.   The right of
the partners is, in effect, a right to share in the surplus left
after discharging all the firm debts.   Each partner has the
right to require all the firm assets to be applied to the pay-
ment of the firm debts; for so, only, can his liability *in solido*
for them be diminished.   But this right of a partner is prop-
erty which can be sold and transferred.   It is effectually sold
and transferred by a sale and transfer, in good faith, of all
his interest in the firm property, whether to his partner or
to a stranger.   Such a sale and transfer dissolves the part-
nership and extinguishes every right which the retiring
partner had in the firm property, including the right to re-
quire it to be applied to the payment of firm debts, unless
such right is preserved by the terms of the sale.   Story,
Partn. (7th ed.), §§ 307, 358, 360; Bates, Partn. §§ 528, 540,
550–552; Parsons, Partn. (4th ed.), §§ 178, 246, 248, 394,
note 1 on page 330, and cases cited; Collyer, Partn. (Per-

kins' ed.), §§ 894, 904, 905; Lindley, Partn. (Am. ed., with Audenreid's notes, 1888), 407, 765; 35 Cent. Law J. 418, and cases cited in note 3 on page 421; 17 Am. & Eng. Ency. of Law, 970–975, and cases cited in note 3; *Case v. Beauregard,* 99 U. S. 119; *Fitzpatrick v. Flannagan,* 106. U. S. 648; *Huiskamp v. Moline W. Co.* 121 U. S. 310, 323; *Baker's Appeal,* 21 Pa. St. 76; *Ladd v. Griswold,* 9 Ill. 25; *In re Lloyd,* 22 Fed. Rep. 88; *Saunders v. Reilly,* 105 N. Y. 12; *Davis v. D. & H. C. Co.* 109 N. Y. 47; *Robb v. Mudge,* 14 Gray, 534. The effect is the same where the remaining partner or other purchaser assumes the debts of the firm. This is a personal contract only, and leaves the retiring partner in the condition of an unsecured creditor. Bates, Partn. § 528; Story, Partn. (7th ed.), 559; 17 Am. & Eng. Ency. of Law, 975; *Robb v. Mudge,* 14 Gray, 534. Such sales of a partner's interest in firm property are presumed to be valid. *Kimball v. Thompson,* 13 Met. 283. The authorities are nearly uniform. Only a few cases are out of line.

These considerations seem to show sufficiently that there are no joint assets of Alfred J. Goss and James B. Goss, and so that the petitioner has the right to go against the individual assets of either in the hands of their respective assignees. The case properly ends here. This covers all the issues tried and on which there was evidence. Whatever else is decided is in the absence of necessary parties, and is based upon inference and conjecture instead of evidence. The property which the court says is subject to the petitioner's claim, as the joint property of the two Gosses, is now actually in the possession of the assignee of James B. Goss for the benefit of his individual creditors. It is held for them and is claimed by them. But they have not been represented in this proceeding, nor their rights investigated. No opinion of their rights, volunteered in their absence, is binding on them. When the petitioner presents her claim

for proof against these assets, she meets a fresh contest with these new creditors. And it may not be so easy to put them down, being present, as when they are absent. It is easy to put the absent in the wrong. *Les absents ont toujours tort.* Whether she has a remedy against those assets can only be known at the end of that contest.

It may be true — it is not necessary to question it — that Alfred J. Goss is estopped, as against this petitioner, to deny that he was a partner with James B. Goss and that these were in fact partnership assets. But this does not aid the petitioner, nor bring her nearer to a remedy against these assets, until it is also established that James B. Goss and his individual creditors are bound by a like estoppel. That cannot be established in this proceeding, because neither the necessary parties are before the court nor the evidence by which it is to be established. And there is great danger of doing the petitioner an irreparable wrong if, with so little knowledge of the actual situation, her remedy is limited by the court to those assets; for, at the best, it is but a desperate chance.

It is said that James B. Goss is also estopped to deny the alleged partnership and the joint ownership of the property used in it. But the court has not listened yet to James B. Goss's side of that question. It is assumed, without proof, that he permitted Alfred J. Goss to hold himself out as a partner, and the property and business as partnership property and business. Certainly, the other side of this question should have an opportunity to be heard before any person's rights should be limited or destroyed by a decision of it. In truth, it is neither alleged nor shown — as, indeed, it could not well be, in the absence of proper parties — that James B. Goss did, in fact, hold out Alfred J. Goss as a partner or as having an interest in the property or business; while it does appear that he conducted the business alone, and had the

sole ostensible possession of the property and business, while Alfred J. Goss lived in another city, miles away, and had no apparent connection with the business.

Apparently the principal part, if not all, of the ostensible property used by James B. Goss in conduct of the business, was the mill itself. It may be a question of some difficulty whether the bare occupation of the mill for the purpose of carrying on the business, without a positive representation of ownership, could estop any person to claim ownership of it according to the true recorded title. Mere occupation of real estate by carrying on a business in it must create a very slight, if any, presumption that the occupant is the owner; for, perhaps, a majority of the business of the country is carried on in rented premises. It has not been claimed before, so far as known, that the mere occupancy of real estate by a business created any presumption against its owner that he was a partner to the business being carried on in his property; and no case has been found which holds that the mere occupancy of real estate by a business creates any estoppel against the owner to claim his own.

But it is not very important whether James B. Goss shall, when the question is presented, be held to be estopped or not. A much more important question will be whether his individual creditors are estopped from claiming that these assets, which are in the hands of his assignee for their benefit, were really his individual assets. No one questions that they were his individual assets in law, and they are his individual assets in equity unless these individual creditors are estopped to claim them as such. Now, there really is no evidence in the case which shows the nature of these debts to the individual creditors of James B. Goss. It seems to be assumed by the majority that they were all debts contracted to persons who gave credit to an ostensible partnership; while, in truth, there is no evidence on the subject. There is nothing to show that these debts are not all due to per-

sons who dealt with him in good faith, relying upon his apparent sole responsibility from the possession of this property and his sole conduct of the business. Nor does it appear whether these debts were contracted in the milling business, or whether they were the misfortunes of independent enterprises. In this condition of the case it certainly cannot be prudent to decide this question of which set of creditors have the superior equity of these assets. It is sufficient to decide such questions as have been tried before the trial court between the parties who were before the court, and which are before this court upon the appeal. If there are *bona fide* individual creditors, they may not be estopped to claim according to the true legal title of the assets, although their debtor be so estopped. Bates, Partn. § 105, and cases cited in note 1, p. 123.

The case really made shows that there are no joint assets, practically, available to the petitioner. If there are any, they are desperate and nominal only. It is not equity to relegate the petitioner to them for her only remedy, for it is not expected that there will be a surplus in either separate estate after the individual creditors are paid. It is a forlorn hope. She should be permitted to share *pari passu* with the individual creditors of Alfred J. Goss.

PINNEY, J. I dissent from the opinion of the court, and concur in the opinion of Mr. Justice NEWMAN.

The following dissenting opinions were filed in the case of *Davies, Appellant, v. Humphrey, Assignee, Respondent:*

NEWMAN, J. This case arises out of the same failures and assignments as *Thayer v. Humphrey*, but in some of its circumstances differs from that case. The appellant was also a creditor of J. D. Putnam & Co., but he did not accept of J. B. Goss & Co. as a substitute for his original debtor. So

he is not a creditor of either James B. Goss or J. B. Goss &
Co.; and neither are in any way liable for his claim.   The
appellant seeks to prove his claim against the estate of Alfred
J. Goss in the hands of his assignee for the benefit of his
creditors.   It is answered to his application: "Your remedy
is against the assets of James B. Goss, which are in the hands
of his assignee for the benefit of his creditors."   And so he
is turned away.   It is not claimed that there are any firm
assets of J. D. Putnam & Co. in existence, nor that either
partner is solvent, nor that the transfer to J. B. Goss & Co.
did not pass the legal title to all the assets of J. D. Putnam
& Co. to J. B. Goss & Co.   But it is held that the right of
the partners to have these assets applied first to the pay-
ment of the debts of the firm was reserved by the terms and
conditions of the transfer.   This is believed to be without a
shadow of foundation in fact.   It is put upon the ground
that the transaction was for the purpose of applying the
assets of the firm to the payment of its debts; and this in
the teeth of all the evidence.   The firm of J. D. Putnam &
Co. was composed of J. D. Putnam and Alfred J. Goss.
Both partners signed and published a notice of the dissolu-
tion of the firm, in which the public was notified that the
same business would be continued by J. B. Goss & Co., who
assumed all the debts of the firm; and the same business
was in fact carried on at the same place by J. B. Goss &
Co. for two years and upward.   It does not seem necessary
to say that the intent to have the business carried on with
the same property is incompatible with the purpose to have
the property applied to the payment of the debts.   The
greater part of the property received by J. B. Goss & Co.
was the gristmill itself.   J. B. Goss & Co. got nothing of
value for the promise to pay the debts of the old firm, unless
they got the right to carry on the business with the prop-
erty received from the old firm.   The real intention of the
transaction is obvious.   It was to make a novation of the

debts of the old firm,— to substitute a new debtor in place of the old one.   This was not altogether effected, because some of the old creditors did not consent to the substitution.   If the purpose was to apply the firm property to the payment of firm debts, the obvious way to make the purpose effectual was to make an assignment of it for the benefit of the firm's creditors.   It seems that this, clearly, was the ordinary case of a transfer of the firm's assets for the purpose of a novation.   In such a case all are agreed that the partners of the old firm lose their equity to have the assets transferred applied to the payment of the firm debts.

This case, too, is decided in the absence of parties and evidence necessary to its final disposition.   The other side is not heard, as it must be before it can be bound by the decision.   *Non constat* that, when these parties and their evidence are heard, J. D. Putnam & Co. will be found estopped, as against the creditors of J. B. Goss & Co., from claiming any right in this property of which they have held out J. B. Goss & Co. to be the owners.

The appellant, on the case as it now appears, should be admitted to share *pari passu* with the individual creditors of Alfred J. Goss, on the authorities cited in the dissenting opinion in *Thayer v. Humphrey*.

PINNEY, J.   I dissent from the opinion of the court, and concur in the opinion of Mr. Justice NEWMAN.