THE FRANKLIN SUGAR REFINING CO. ET AL. *vs.* HENDERSON, PFEIL & CO. ET AL.

*Partnership—Firm Creditors Entitled to Priority of Payment Out of Partnership Assets—Fraudulent Conveyances—Assignment of Interest in Insolvent Firm by Retiring Partner—Attachment— Assignment for Benefit of Creditors.*

Creditors of a partnership have a right to insist upon the payment of their claims out of the partnership assets before those assets are appropriated to the payment of the separate debts of any members of the firm.

Any act of the partners which is destructive of this right of the firm creditors to be first paid out of the firm's property, is an act which the law regards as delaying and defrauding such creditors, if the partnership is insolvent.

A transfer by one partner of all his interest in the firm to his co-partner, when the firm is insolvent, is fraudulent as against partnership creditors, because it destroys their preference in the distribution of the partnership assets.

The same principle is applicable when the transfer is made by one re-tiring partner to two or more of his copartners who continue the business, because in such case the claims of the creditors of the former firm are subordinated to, or placed on an equal footing with the claims of the new firm's creditors.

· When a partnership composed of three persons is insolvent, and a con-veyance of all his interest in the firm is made by one partner to the others, who continue the business, an assignment by them for the benefit of creditors generally ten days thereafter is fraudulent in law and justifies an attachment by the creditors of the first partnership.

Appeals from *pro forma* orders of the Superior Court of Baltimore City, quashing writs of attachment laid in the

hands of the assignee for the benefit of creditors of the firm of Henderson, Pfeil & Co.

The cause was argund before McSHERRY, C. J., BRYAN, BRISCOE, PAGE and BOYD, JJ.

*Frank Gosnell* and *William S. Bryan, Jr.* (with whom was *James W. McElroy* on the brief), for the appellants.

While it is not denied that the lien of partnership creditors upon the partnership assets is derived through the right of each separate partner, to have all the partnership asscts applied to the payment of the partnership debts, before any part of it is applied to the separate use of any of the partners, and that when a partnership is solvent, the partners can, when acting in good faith and for a valuable consideration, waive their lien and convert partnership property into separate property, and thus destroy the derivative lien of the partnership creditors upon the partnership assets, it is confidently maintained that such conversion can only take place when (*a*) the concern is solvent, and (*b*) the partners are acting in good faith and for a valuable consideration.    On principle this must be so.    As long as a man is solvent and able to satisfy all just claims against him, no one but himself has any interest in his property, and no disposition which he may make of it by gift or otherwise, gives any other person a right to complain, because it cannot injuriously affect the rights of such other person.    But as soon as he becomes insolvent, a different state of case arises, and the law prohibits his doing anything " to the end, purpose and intent to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts," etc.   For this reason a man is required to be just before he is generous, and is not permitted to make a free gift of his property to his children and leave his creditors unsatisfied. *Benson* v. *Benson*, 70 Md. 253.    As long, therefore, as a partnership is solvent, it works no wrong to the partnership creditors for the partnership property to be

converted into the individual property of the several partners. But when the partnership is insolvent, then any disposition of the social assets which destroys the partnership lien will "hinder, delay or defraud" the partnership. And it is believed the overwhelming weight of modern authority recognizes this, and makes it a condition precedent to the destruction of the partnership lien upon partnership property that the partnership shall be solvent; that the assignment shall be in good faith, and for value. *Collier* v. *Hanna*, 71 Md. 269; *Flack* v. *Charron*, 29 Md. 318; *Griffith* v. *Buck*, 13 Md. 102.

That the solvency of the concern is a condition precedent to the valid conversion of the partnership property into individual property is also recognized in *Gable* v. *Williams*, 59 Md. 52; *Maennel* v. *Murdock*, 13 Md. 177; *re Kemptner*, *L. R.*, 8 Equity, 287; *Bank* v. *Carrollton R. R.*, 11 Wallace, 628; *Darby* v. *Gilligan*, 33 W. Va. 249.

*Alfred S. Niles* and *Oscar Wolff*, for the appellees.

1. The condition of the firm of Henderson, Pfeil & Co. on October 4th, 1865, was one of solvency, as solvency is defined in all the cases. *Castleberg* v. *Wheeler*, 68 Md. 277; *Bell* v. *Ellis*, 33 Cal. 620; *Buchanan* v. *Smith*, 16 Wall. 308; *Regina* v. *Sadlers Co.*, 10 H. L. C. 425.

2. This being so, Henderson had a perfect right to assign his interest in the firm to his partners and they took it by a clear title, freed from any *quasi* lien, arising from Henderson's previous connection with the firm. This is conceded by all the authorities. *Ex parte Ruffin*, 6 Vesey, 119, 126; *Glenn* v. *Gill*, 2 Md. 398; *Flack* v. *Charon*, 29 Md. 311; *Collier* v. *Hanna*, 71 Md. 253.

3. When by an extraordinary and entirely unforseen combination of circumstances the new firm found itself unable to meet its obligations in full, the partners at once acted as the Courts say they ought to have acted, viz., assigned all their property for the benefit of their creditors without preference, save as provided by law. *Ferrall* v. *Farnen*, 67 Md.

76; *Collier* v. *Hanna*, 71 Md. 257; *Pfaff* v. *Prag*, 79 Md. 372.

4. Assuming the validity of the transfer of Henderson's interest, it must be conceded that the deed to Mr. Wolff was not only a valid and proper deed, but the only kind of deed appropriate or proper under the circumstances.

The story of the case in a nutshell is this: Henderson sold out his interest in a solvent firm to his copartners. They carried on the business for a short time and until they were subjected to a demand which was outside of the ordinary course of business, which they had no reason to expect, and which they were unable to meet. Then, they acted as honorably as men could act, and did what the law approves They deserved the sympathy and good will of all their creditors (instead of all but four), and they deserve commendation and not stigma at the hand of the Court.

McSHERRY, C. J., delivered the opinion of the Court.

These four cases come up from a *pro forma* order quashing attachments sued out by the appellants against the appellees, Henderson, Pfeil and Company. In November, eighteen hundred and ninety-two, John B. Henderson, George Henry Pfeil and Alexander J. McDonald formed a copartnership which carried on business in Baltimore City until October the fourth, eighteen hundred and ninety-five. On that day the copartnership was dissolved. It was indebted at the time to sundry persons, but whether it was insolvent or not is one of the controverted issues of fact that will be considered later on. Henderson sold his interest in the concern to his associates, and assigned and made over to them all of his right and title, as a member of the firm, in and to the property and assets of every kind, real, personal and mixed, owned by the copartnership. Notice of dissolution was given and Pfeil and McDonald at once formed a new firm under the old name. Just ten days afterwards— that is, on the fourteenth day of October, eighteen hundred and ninety-five—Pfeil and McDonald executed a deed of

trust to Oscar Wolff, Esq.   The deed was made by " George H. Pfeil and Alexander J. McDonald, trading as Henderson, Pfeil and Company," and is *not* signed by Henderson.   It recites that " the parties of the first part," that is Pfeil and McDonald, " are indebted to divers persons and firms in various sums of money, and have become and are unable to pay such indebtedness in full ; and that, " in order to have *their* assets and effects collected and faithfully applied to the payment of *their said debts* " (that is, the debts due by the grantors) the assignment was made.   After making provision for the payment of costs and commissions and such preferences as the law creates, the deed proceeds to declare that the trustee shall apply the " proceeds of the joint stock of the *said* copartnership "—that is, the copartnership of which Henderson was *not* a member—to pay the creditors of the copartnership, that is, the copartnership composed of Pfeil and McDonald, " and to appropriate the net· proceeds of the separate estate of each partner to pay his separate creditors," and the surplus of each partner's separate estate after the payment of his individual creditors is directed to be added to the social assets, and the surplus, if any, of the partnership assets is directed to be divided between the partners in the proportions of their respective interests, and to be applied to the payment of their separate debts.   It is important to observe that the deed of assignment makes no reference whatever to the old firm of which Henderson had been a member, and contains no provision, in terms or by implication, for the payment of the creditors of *that* firm out of the assets owned by it on October the fourth, the day of its dissolution.

On October the fifteenth—the day following the execution and recording of the deed of trust—the appellants, who are creditors of the old firm of Henderson, Pfeil and Company, sued out of the Superior Court of Baltimore City, attachments which they caused to be laid in the hands of Mr. Wolff as garnishee.   They allege, as one of the grounds upon which the attachments are founded, that Henderson,

Pfeil and McDonald have assigned, disposed of or concealed or are about to assign, dispose of or conceal their property or some part thereof with intent to defraud their creditors. The garnishee appeared, pleaded *nulla bona* and filed a motion to quash, founded on the claim that the property and assets attached were the property and assets of Mr. Wolff, the trustee, and not of the defendants. The motion was heard and the learned Judge at Large was of opinion that the motion to quash ought to be overruled ; but by an agreement made between the parties a *pro forma* order was signed overruling the motion and finally quashing the attachments. From this *pro forma* order the pending appeals were taken.

A reversal is claimed upon two grounds, and these are : First, that the deed of trust to Mr. Wolff is fraudulent in law as hindering and delaying the creditors of the old firm ; and, secondly, that the deed is fraudulent in fact.

We may as well dispose of the second ground first, because but little need be said repecting it. The record has been minutely read and carefully considered, and we all agree that it furnishes not the slightest warrant for impeaching the deed on account of actual fraud. The conduct of Mr. Wolff throughout is free from the faintest shade of bad faith. There is nothing to suggest even a suspicion that he was not actuated by the very highest and most honorable motives and intentions ; and there is no evidence whatever that can be tortured into an imputation of bad faith. We are thoroughly convinced that the trustee acted in the utmost good faith ; and we accordingly dismiss this branch of the case without further comment, and turn, at once, to the consideration of the other.

Partnership creditors have no lien on partnership assets, but the partners themselves have a right to insist upon the appropriation of the joint property to the payment of joint debts, upon the principle that as the joint debts were contracted in making the purchases of the joint assets the latter ought primarily to be charged with the burden of paying the

former.   The right of the partners to have the joint debts
paid out of the joint assets in preference to the right of the
separate creditors to be paid out of the same assets, gives
rise to the derivative equity of the joint creditors to have
payment of their claims out of the proceeds of the copart-
nership property before any of those proceeds can be de-
voted, either to the separate use or appropriated to the pay-
ment of the separate debts of any of the members of the
firm.   The derivative right is the right of the creditor—it
belongs to him—and the partners have, if insolvent, no
power or authority to destroy or impair it to his injury or
prejudice.   This is so in the very nature of things.   Any
act, therefore, of the partners which is destructive of this
right of the creditor and which, as a result, hinders, delays
and interferes with his assertion of it and impedes his
ability to realize, through its enforcement, the payment of
the debt due to him by the firm, is, by operation of law, a
fraud upon the creditor, if the copartnership is itself insol-
vent.   This principle has been often applied.   In a number
of cases it has been held, and it may certainly be regarded
as the law of Maryland to-day, that the conversion of the
firm's assets into individual assets by an assignment from
one partner of all his interest in the concern to another,
works a conversion of the property from joint to separate
property, and when the firm is insolvent, operates to hinder,
delay and defraud the firm's creditors, if the transfer be per-
mitted to stand.   It is obvious that this must be so.   As the
creditor's preference or priority to be paid out of the joint
property can only be worked out through the partner's right
to have that property applied in the first instance, to the pay-
ment of the firm's creditors ; and as the individual creditors
have a prior right to require that the separate estate shall be
first applied to the satisfaction of the individual debts, it
necessarily follows that the conversion of the joint property
into separate property, if sustained, would, when the firm
and its members are insolvent, destroy the right of the part-
nership creditors to a preference over the creditors of the

individual partner to whom the assets had been transferred ; because when the assets cease to be joint assets the right of the partner to have them applied to the payment of partnership debts is gone, and when that right is gone the derivative right of the firm's creditor is extinguished.  This being the consequence of such a transfer of the assets, the transfer itself, when the firm is insolvent, is inhibited and is deemed ineffectual to convert the joint property into separate property as against the firm's creditors.  *Collier* v. *Hanna,* 71 Md. 261 ; *Darby* v. *Gilligan,* 33 W. Va. 249 ; *S. C. with notes,* 6 L. R. A. 740.

Whilst this principle is not denied as being applicable to a case where a transfer has been attempted by one or more partners to another singly, it is insisted that it has no relation to a case where the transfer has been made by a retiring partner to *two or more* of his copartners who continue business ; and the reason assigned is that the joint assets are not, by such a transfer, converted into separate assets but remain the joint property of the copartners to whom they are transferred.  The difference in the facts does not produce a difference in the result, so far as respects the creditors.  By the express agreement of the three partners and by the withdrawal of Henderson from the firm the copartnership of Henderson, Pfeil and Company was dissolved at the close of business on the fourth day of October, eighteen hundred and ninety-five.  The new copartnership was at once formed and under the transfer from Henderson assumed to acquire all his rights and title to the old firm's property.  The transfer of the old firm's whole assets to the new firm, if valid, as effectually precluded the old firm's creditors from asserting their derivative right through the equity of the old firm's members as though the assets had been converted into the separate assets of one member ; because, whilst in the latter instance the right would have been lost by reason of the separate creditors being preferred, in the other instance the old firm's creditors' right would have been lost by being either subordinated to the claims of

the new firm's ceditors, or, by being placed on an equal footing with it.   17 *Am. & Eng. Ency. Law*, 978, 979 and notes 1, 2, 3 ; *Huiskamp* v. *Moline Wagon Co.*, 121 U. S. 310.

It is not solely because the transfer by one to another partner converts the joint into separate property that such a transfer is, when the firm is insolvent, prohibited as against the joint creditors ; but it is because by such a conversion, if effective, the equity of the joint creditors to have a priority through the lien of the partners would be destroyed. The destruction of this lien and the consequent extinguishment of the creditor's derivative equity, is the injurious act —it is the detrimental *end ;* the transfer itself is merely the *means* by which that end is accomplished.   The law levels its inhibition at the means merely because the end worked out by those means is injurious.   The results are the things with which it is chiefly concerned.   If the equity of the joint creditor is destroyed by a transfer that does not convert joint into separate property, the result to the creditor is precisely the same as though the joint had been converted into separate assets ; and it will not do to say that the right of the creditor to relief depends on the *manner* in which the means employed to defeat him may produce their result, rather than on the ultimate fact that he has in reality been defeated by those means.   And so whilst a transfer of all his interest by one to two other members of an insolvent firm may not convert what was joint into separate property ; it nevertheless does, *if effective at all*, by divesting that property out of the old and vesting it in the new firm, as completely defeat the equity of the old firm's creditors and subordinate that equity to the equity of the creditors of the new firm ; or, place the equity of the latter on an equality with that of the former.

We have just said that the transfer by one to two other members of an insolvent firm conveying the retiring partner's interest in the joint property, *if effective at all* as against the creditors of the firm, is prejudicial to their

equity. But is such a transfer any more effective when assailed than the transfer from one or more to another member of such a firm would be? In *Collier* v. *Hanna, supra,* we held that a transfer from one to another member of an insolvent firm cannot be upheld against the firm's creditors, and precisely the same conclusion must be reached in the other instance. Thus in *Peyser* v. *Myers,* 135 N. Y. 599, there were two sets of creditors, there was a change in the firm, and in discussing the respective rights of these creditors the Court said : " The priority of the lien of firm creditors is not divested by a transfer by an insolvent firm of the firm assets to *one or more* of the partners, nor can it be effected, as we conceive, by any mere change in the personnel of the firm, as by the withdrawal of one partner from the firm or the introduction of a new member." See also *Phelps* v. *McNealy,* 66 Mo. 554 ; *Thayer* v. *Humphrey,* 91 Wis. 276 ; 30 L. R. A. 549.

It was said in the argument that no case could be found where the doctrine announced in *Collier* v. *Hanna* had been applied to the state of facts presented by this record—that is, where a retiring partner had transferred his interest in the social assets to two or more remaining members of the firm. But it is not material whether a parallel case can be cited or not—we are not dealing with precedents, but with principles ; and if the legal principle underlying the one state of facts is applicable to and fits the other state of facts, the mere circumstance that no adjudged case actually applying such principle can be produced, furnishes no reason for refusing to make the application when the occasion does arise. But the case of *Peyser* v. *Myers, supra,* distinctly recognizes the doctrine as applicable to such a case as this.

This brings us to the deed of trust, and in the light of what has been just stated we are to determine whether its legal effect is to hinder and delay the creditors of the old firm, and whether, therefore, it is in law fraudulent and invalid as to those creditors. The whole discussion thus far has proceeded upon the theory that the firm of Hender-

son, Pfeil and Company, was insolvent on October the fourth, eighteen hundred and ninety-five ; and what we have said must be understood in that view ; and as the ultimate decision of these cases hinges on the question of solvency, we now proceed to consider that question before examining the terms of the deed of trust.

Henderson retired from the old firm on Friday, October the fourth.    The new firm took charge at the close of business on that day.    They continued in business until Monday the fourteenth, when the deed of trust was made. Excluding the two intervening Sundays—the sixth and the thirteenth—they conducted the business for just *seven* days. On Saturday the twelfth of October—the last of those seven days—the new firm was, as a matter of fact, no worse off financially than it had been on the preceding fourth of the same month.    This is distinctly stated in the evidence of Pfeil and nowhere controverted.    On the fourteenth, when the deed of trust was executed, the firm's financial condition had not changed from what it was the prior Saturday. As its condition on the fourteenth was no worse financially than on the fourth, if it was insolvent on the fourteenth it could not have been solvent on the fourth.    That it *was* insolvent on the fourteenth is abundantly evident from the recitals in the deed itself and from the statement of its liabilities and assets furnished by the trustee to the creditors. Its liabilities on the fourteenth were over fifty-six thousand dollars ; and its actual assets were something over thirty-one thousand dollars—which were afterwards swelled some five thousand dollars by book accounts collected, but were diminished in the neighborhood of three thousand dollars by a sale of the plant at less than the estimated value.    Its liabilities were far in excess of its assets when the assignment to Mr. Wolff was made, and it was no worse off financially *then* than when Henderson withdrew ten days previously.    Its collapse in seven business days with no cause existing to produce that result other than the demand of some of the old firm's creditors for the payment of overdue

debts, conclusively shows that it was utterly insolvent—unable to pay its debts when due and demandable—at the time Henderson retired; especially as at the time the deed was executed the firm was confessedly no worse off financially than it had been on October the fourth. We are convinced, then, that both the old and the new firms were insolvent on October the fourth.

The deed of trust, as we have seen, was signed only by Pfeil and McDonald and made provision solely for the payment of the debts due by the copartnership composed of those two individuals. The quotations we have made from the deed are quite sufficient to show this conclusively. The deed thus undertakes to treat the assets which the trustee claims under it—and they are largely the assets which belonged to the *old* firm—as the property of the new firm; and it further undertakes to appropriate those assets to the payment of the new firm's debts without the slightest regard to the rights of the creditors of the old firm who are not creditors of the new concern. Had the transfer by Henderson been made by himself and by one other member of the firm to the remaining member, the firm itself being insolvent; and had the purchasing member executed a deed of trust providing for the payment of *his* debts, the deed would, under these circumstances, have been invalid. *Collier* v. *Hanna, supra*; *Gable, Trustee,* v. *Williams,* 59 Md. 53. For the reasons we have already suggested, the mere fact that the transfer by Henderson was made to *two* members of the old firm, does not rescue the deed from condemnation. The deed entirely ignores, and if effect were given to it, it would utterly destroy the privilege or preference to which the creditors of the old firm are entitled, of having the debts due to them paid out of the assets of the old firm; and it would destroy this preference notwithstanding no transfer by any member of an insolvent firm to the other members thereof can be efficacious to defeat the rights of such creditors. The deed expressly dedicates the property conveyed by it to the payment of the creditors of

the grantors.   This, Pfeil and McDonald had no right to do. The insolvency of the old firm  at the time of  Henderson's attempted transfer  of his interest  therein  to  his  copartners prevented that transfer from becoming  effective  as  against the right of the creditors of Henderson, Pfeil and Company to work out their equities through the lien  of the partners ; and, therefore, did not vest the title in  the remaining  partners as a *bona fide* sale  by a  partner of a  solvent concern would have done.   The transfer by Henderson to Pfeil and McDonald did not clothe the latter with a  title which they could by a deed of trust convey for the benefit of *their* creditors alone ; and consequently the deed  of trust, which by its terms excludes the creditors of the old firm, is a conveyance that hinders, delays and defrauds those creditors.  The deed is, and can therefore be, no  barrier to  the  condemnation of the credits attached in the hands of the trustee.

The *pro forma* order  quashing the attachments will be reversed and the cases will be remanded for further proceedings ; and it is accordingly so ordered.

> *Pro forma order reversed and cases remanded, the costs to be paid out of the trust estate.*

